HARRY BERLOWE, complainant-respondent,

*v.*

AARON NEWMAN et al., defendants-appellants.

[Submitted October term, 1944.   Decided January 19th, 1945.]

*Messrs. Schotland, Harrison & Schotland (Mr. Philip J. Schotland,* of counsel), for the defendants-appellants.

*Mr. Ferdinand D. Masucci (Mr. Sidney R. Pine,* of counsel), for the complainant-respondent.

The opinion of the court was delivered by

THOMPSON, J.

The appeal is from a decree setting aside ·a conveyance of the stock and assets of a retail liquor store owned by Franklin

Stores Co., a corporation, one of the defendants in the cause, to the two individual defendants Julia Englander and Aaron Newman in the month of July, 1941. The store was one of seven owned by the corporation and was located at 401 Main Street, Orange, New Jersey. The stockholders of the corporation were all members of the Englander family.

The complainant was a judgment creditor of Franklin Stores Co. He recovered his judgment December 9th, 1942, in the Essex Common Pleas in the amount of $930.96 damages and costs, upon a claim assigned to him by Chester Brewing Company, to whom Franklin Stores Co. was indebted for merchandise delivered to it by Chester Brewing Company on May 7th, 1941.

The decree now under review here held the conveyance in question to have been fraudulent within the purview of *R. S. 25:2–1 et seq.;* that it was made without consideration at a time when the corporation was insolvent; and that it was null and void and of no effect against complainant's judgment.

The corporate defendant was served, but it filed no answer. The defendant Newman answered, but did not testify. While his answer disclaimed knowledge as to the allegations in the bill concerning complainant's judgment, and denied the remaining allegations, he nevertheless concludes the pleading with the statement, "that in truth and in fact, all he has personal knowledge of is that he became a silent partner in said business with Julia Englander upon an investment of $100 which he paid in cash to Julia Englander, and that he has been employed in said business as an employee since about May 1st, 1941, and during his entire employment Julia Englander has been in possession of said store as owner."

The defendant Julia Englander answered and testified at the trial. Her answer denied the alleged insolvency of the corporation at the time of its conveyance of the store and business in Orange to her, denied the alleged want of consideration for the transfer, and asserted the consideration to have been "based upon the settlement of the litigation in this court between Franklin Stores Co. and this defendant and others, the claims of this defendant to shares in the Franklin Stores Co. and the assumption by this defendant

of certain specified debts owing upon fixtures in the said store premises by the Franklin Stores Co."

On the issue of solvency the financial condition of Franklin Stores Co. is properly to be adjudged with reference to the approximate dates of the activities involving the transfer of the Orange store to Julia Englander. She says in her answer she was in possession on May 1st, 1941, and continuously thereafter, but "she admits that the final transfer of the license and the final quit-claiming of the store to her by the Franklin Stores Co. was consummated some time later, after litigation in this court between the Franklin Stores Co. and this defendant was settled." The agreement of sale is dated July 14th, 1941. The bill of sale printed in the record is blank as to the day in the month, but it shows the month to be July, 1941. Presumably it followed the agreement. Defendant's brief in this court admits that "the physical transfer of this store was in May of 1941 and the settlement of all the litigation and the delivery of the bill of sale and releases was July 14th, 1941." The stock of the corporation was owned by Mrs. Wittel Englander, the mother, Louis and David Englander, her sons, and, as to forty shares, either Jacob Englander, another son, or Julia Englander, his wife, the latter claiming to have acquired it by gift from her husband Jacob in the year 1933. It is this block of forty shares that Julia Englander claims to have surrendered to the corporation in July, 1941 (upon the settlement of the pending litigation over it in Chancery), as the consideration for the transfer of the Orange store to her. The mother was president of the corporation, David was secretary and treasurer, and Louis was the company's attorney. Litigation and disputes among the family were rife, recrimination and acrimony common. A spirit of enmity prevailed and things were not going well financially. Jacob Englander testified that he was employed by the company; that he would be paid his weekly salary and then be asked to contribute it, or some of it, back; "they were short in some money——." At the time Jacob left the employment early in May, 1941, "the Franklin Stores were in the midst of a strike." A draft for $300, given by Franklin Stores Co. on account of complain-

ant's claim, had gone to protest for insufficient funds at the bank. Complainant besought David Englander to do something about it. David referred him to "brother Louie;" this was in June, 1941. Louis told him the corporation had no money and gave him his personal check for $300 which was cashed. According to complainant's testimony Louis enumerated a number of creditors of the corporation to whom it was indebted in various substantial sums ranging in amounts $7,500, $20,000, $15,000, $2,500. Louis told him, "We owe a lot of money." Complainant later obtained his judgment and found that the corporation had transferred all its stores "to different corporations." The Orange store had been transferred July 14th, 1941, after complainant's futile efforts to collect the balance of the debt.

George J. Janoff, an attorney-at-law in New Jersey, was associated with Louis Englander in the latter's law office from 1936 to 1943. He handled claims and litigations against Franklin Stores Co. They were many and pressing in 1941. He was present at the conferences with David and Louis Englander when plans were considered and developed to transfer the various stores out of the corporate ownership, dividing and distributing the liabilities among the various new ownerships. The transfers were effected in 1941, perhaps one in early 1942. The general plan was to allocate the corporation's total liabilities proportionately to each of the recipients of the respective separate properties. Janoff handled the organizational details for some of the new ownerships. The figures of the cost to each came out to the value of the stock on hand at cost (wholesale cost to retailer) plus the value of fixtures. Janoff testified, "Now, the fixtures were taken in on Dave's best recollection of actual cost plus a sum which varied from $2,500, as I recall it now, to about $4,000." That was "for good will, and which was to make up the difference in liabilities at that time," * * * "It was obvious to me that their liabilities did exceed their assets. Q. By how much? A. I would say, by at least twenty to thirty thousand dollars." Janoff stated that he did not know about the details of the transfer of the Orange store to Julia Englander, or what the formula was in that instance. His

testimony is significant and important, however,. as bearing upon the general procedure to divide up the holdings among the various family interests at the time the corporation was undergoing the financial and litigation stress indicated in the evidence.

We have reviewed the testimony presented in the record and are persuaded that the court below correctly deduced from it the existence of a financial condition of Franklin Stores Co. at or about the time of the transfer of the store in Orange to the defendant Julia Englander that amounted to insolvency as defined in *R. S. 25:2-8*. The whole picture presented by the evidence is convincing that the motive and purpose of the distribution of the store properties among the beneficial owners of the corporation in the manner described in the testimony were to avoid and evade an impending bankruptcy or insolvency proceeding on the part of one or more creditors to the ultimate detriment of the personal interests of the owners of the corporate stock. The course of the corporation was headed that way, and the quarreling owners of it were able to agree at least to a plan to divide the properties, which plan of necessity required that each, at least in form, should assume a share of the obligations which the corporation itself could not meet. This action in itself was weighty evidence of the unsound financial condition of the corporation.

As to the alleged consideration for the transfer to the defendants Newman and Julia Englander, the defendants claim such consideration to have been constituted by a settlement of a suit pending in the Court of Chancery, by the terms of which settlement Julia Englander agreed to surrender her interest in forty shares of stock of the corporation which she claimed to own in her own right, but which the corporation and other shareholders disputed. Whether the stock actually belonged to her or not, she could not legally bargain with it for a share of the corporate assets under the conditions that prevailed concerning the ability of the corporation to meet its debts and obligations.

The history of the forty shares of stock as disclosed in the evidence is somewhat interesting. It appears to have been

owned by Jacob Englander in 1933, in which year he went into the liquor rectifying business. According to his testimony he at that time transferred the forty shares to his wife, Julia Englander, but he did not deliver to her the certificate for the shares nor have them transferred on the books to her, nor assign them to her by any written instrument, though he says he signed the certificate in blank and gave it to his brother, Louis Englander, to hold in trust for Julia Englander. Asked by the court why he did not put her name in it, he answered rather vaguely at first, but on then being asked if he wanted to have other liquor retailers believe he was not in the retail liquor business, he replied, "That's right. Q. You were trying to fool the other people you were dealing with? A. No, not exactly. It was a common thing." Julia Englander testified that she had never seen the certificate; she never attended a stockholders meeting; nor had she made any demand for the stock. Jacob Englander made an affidavit on June 10th, 1941, in a litigation pending in the Court of Chancery between Franklin Stores Co., complainant, in which Jacob Englander was one of the defendants. In that affidavit Jacob Englander, in relating certain history of his connection with and activities in the corporation, included the incident of his effort to get back from Louis B. Englander the stock he had given to Louis. His language in the affidavit as to that incident is, "I demanded the return of *my* stock from Louis B. Englander, to whom I had delivered same, but was refused." A reading of the record discloses a number of instances in which Jacob Englander and his wife, Julia, in adverting to this stock in various connections unconsciously indicated the real interest as in Jacob, but then correcting the expression to be consistent with ownership in Julia. For instance, Julia Englander, in an affidavit also made by her on June 10th, 1941, stated that her mother-in-law (Wittel Englander) "assured me there would be no question about it and that the Irvington and Orange stores would belong to my husband, Jacob Englander." When asked about that as a witness on the stand in the present suit, she said, "As far as that saying 'my husband, Jacob Englander,' it was to me, * * *." It seemed to have been necessary to get the mother's

consent or direction as to what Julia Englander and Jacob Englander were to get by way of distribution of the assets. These instances of apparent slips of the tongue in affidavits and testimony, and frequent recourse to equivocal use of pronouns to support defendant's claim of ownership, create a strong suspicion that, whatever may be claimed, the true interest was always privately conceived to be that of the husband, Jacob. However, it suffices to state that the over-all operations of the parties concerned, in their relations to the corporation and among themselves, were quite casual and without particular observance of the ordinary legal and business formalities. Claims and interests on the part of different members of the family were asserted according to the moods and exigencies of the occasion. Putting the best light on Julia Englander's assertion of ownership of the stock she says she used, in effect, to purchase the Orange store from the corporation, she still could not legally do that in the manner it is asserted to have been done. No stockholder of a corporation has the privilege of operating in that fashion so long as the corporation has creditors and is unable to meet its obligations. It is unnecessary to enter into any elaborate elucidation of this principle. It is part of the fundamental corporation law. The contract between Julia Englander and the corporation was fatally defective because of its illegality, even assuming that Julia Englander honestly believed that she owned the stock and was correct in that belief or not. Thus, there was no consideration for the transfer, and the decree below is the correct disposition of the case, and is therefore affirmed.

*For affirmance*—THE CHIEF-JUSTICE, PARKER, CASE, BODINE, DONGES, PERSKIE, PORTER, COLIE, WELLS, RAFFERTY, THOMPSON, DILL, JJ. 12.

*For reversal*—None.